2344

Belinda MULLINAX, Respondent v. WINN-DIXIE STORES, INC., Employer and Winn-Dixie Stores, Inc., Carrier, Appellants.

(458 S.E. (2d) 76)

Court of Appeals

GOOLSBY, J., filed dissenting opinion.

*Jack D. Griffeth,* of *Love, Thornton, Arnold & Thomason,* Greenville, *for appellants.*

*Harry A. Chapman, Jr.* and *Michael Don Stokes,* of *Chapman, Harter & Groves,* Greenville, *for respondent.*

Heard Oct. 6, 1994.

Decided May 8, 1995; Reh. Den. June 15, 1995.

## ORDER

After rehearing the above case, it is ordered that the opinion heretofore filed be withdrawn and the attached opinion be substituted.

And it is so ordered.

/s/ Jasper M. Cureton
/s/ Carol Connor

For the reasons given in my dissent, I do not believe the earlier opinion of this court should be withdrawn.

/s/ C. Tolbert Goolsby, Jr.

CONNOR, Judge:

This matter is before us on a petition for rehearing. Our previous decision is reported in *Mullinax v. Winn-Dixie Stores, Inc.,* Op. No. 2176 (S.C. Ct. App. filed April 25, 1994) (Davis Adv. Sh. No. 10 at 29). The employer, Winn-Dixie Stories, Inc., applied to the South Carolina Workers' Compensation Commission in June 1991 to stop temporary total compensation benefits to Belinda Mullinax, who suffered a compensable injury in February 1991. The Commission, adopting the order of the single Commissioner, allowed Winn-Dixie to stop benefits. It further found Mullinax reached maximum medical improvement on June 3, 1991, and suffered a 20 percent permanent partial disability to her back. On appeal, the circuit court reversed the Commission, finding the Commission's order was not supported by substantial evidence. We affirm the circuit court, and remand to the Commission.

## I. FACTS

Mullinax injured her back on February 8, 1991, while lifting up to sixty-pound bales of flour, sugar, and corn meal at Winn-Dixie. She first sought medical treatment for back pain, and subsequently for incontinence she claims resulted from the injury.

All parties stipulated Mullinax injured her back in the course of her employment, and Winn-Dixie admitted compensability for her back injury. Disagreement existed, however, concerning the extent of Mullinax's disability and the relationship her incontinence bore to the accident. Mullinax alleged she had not reached MMI and needed continued medial treatment for both her back and urinary problems. Winn-Dixie, on the other hand, argued further medical care would not reduce the period of disability to her back. It further asserted her incontinence was the result of a prior hysterectomy and "not work related nor related to any problem caused by treatment for her work-related injury."

Four significant doctors evaluated Mullinax prior to the hearing before the single Commissioner on October 15, 1991. First, she saw a neurosurgeon, Dr. S.R. Littlepage. He referred her to Dr. Thomas R. Scott, a neurologist, and Dr. Woodrow W. Long, Jr., a urologist. Also, her attorney sent her to Dr. George R. Bruce, an orthopaedic surgeon. The reports of these doctors were submitted without objection at the hearing. Additionally, the Commissioner took testimony from Mullinax, two of her friends, and Barbara Elizabeth Dawson, a nurse and employee of Crawford & Company, Winn-Dixie's insurance carrier.

After the hearing, the Commissioner ordered independent orthopaedic and urological evaluations by Dr. C. Glenn Trent, Jr., an orthopaedist, and Dr. J. David Rice, a urologist. The Commissioner specifically found in his order "that two (2) additional independent medical evaluations would be helpful or a determination of the issues before me." Thereafter, Doctors Trent and Rice examined Mullinax in November and December.

The Commissioner issued a final order granting Winn-Dixie's stop payment request on February 11, 1992. He held Mullinax reached MMI on June 3, 1991, and, therefore, needed no further medical care. He awarded Mullinax a twenty percent permanent partial disability rating to the back. Moreover, he specifically found Mullinax's incontinence unrelated to the accident.

## II. STANDARD OF REVIEW

The standard for judicial review of the decisions of administrative agencies is contained in the Administrative Procedures Act. S.C. Code Ann. § 1-23-380 (Supp. 1994). We may not substitute our judgment for that of the agency concerning the weight of the evidence on questions of fact. *Id.* In a workers' compensation case, the Commission alone is the ultimate factfinder. Where the medical evidence conflicts, the findings of fact of the Commission are conclusive. *Hoxit v. Michelin Tire Corp.*, 304 S.C. 461, 405 S.E. (2d) 407 (1991). The test is whether the decision of the Commission is supported by substantial evidence. Substantial evidence is not a mere scintilla of evidence, nor the evidence viewed blindly from one side of the case, but is evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion that the administrative agency reached in order to justify its action. *Miller v. State Roofing Co.*, 312 S.C. 452, 441 S.E. (2d) 323 (1994); *Stokes v. First Nat'l Bank*, 306 S.C. 46, 410 S.E. (2d) 248 (1991). The decision of the Commission may be reversed only if substantial rights of the claimant have been prejudiced because the administrative findings are clearly erroneous in view of the substantial evidence on the record as a whole. *Lark v. Bi-Lo, Inc.*, 276 S.C. 130, 276 S.E. (2d) 304 (1981).

The Supreme Court most recently applied the substantial evidence test in *Grayson v. Carter Rhoad Furniture*, 317 S.C. 306, 454 S.E. (2d) 320 (1995), *aff'g as modified*, 312 S.C. 250, 439 S.E. (2d) 859 (Ct. App. 1993). Grayson, a furniture mover, injured his back while moving a sofa. He continued to work for a few weeks, then had to stop for several weeks. His orthopaedist conditionally released him to return to work, with the caveat "be somewhat careful with lifting." Carter Rhoad petitioned to stop temporary total disability benefits. The Commission stopped benefits. The circuit court reversed, finding no substantial evidence to support the Commission's action. The Supreme Court affirmed the circuit court and held Grayson could not return to work "without restriction"[1] because as a furniture mover, his job required heavy lifting. Ad-

---

[1] S.C. Code Regs. 67-504(C) (1990) allows an employer to suspend compensation benefits

ditionally, the court found evidence Grayson actually returned to work, albeit in pain, was not evidence he had admitted he could work without restriction. Therefore, the Court held the record contained no evidence his period of temporary total disability had ever ended.[2]

### III. ISSUE

From the outset, we recognize the evidence is conflicting concerning whether Mullinax reached maximum medical healing to her back and, therefore, we do not attempt to resolve that issue. There is, however, no evidence to support the Commission's finding that Mullinax's incontinence was not related to the accident; the only evidence before the Commission demonstrates that either the injury itself or treatment for the injury aggravated the incontinence.[3]

### IV. LAW

Our courts have clearly held the natural consequences flowing from a compensable injury, absent an independent intervening cause, are compensable. *Whitfield v. Daniel Constr. Co.*, 226 S.C. 37, 83 S.E. (2d) 460 (1954). Moreover, the great weight of authority holds the aggravation of the primary injury by medical or surgical treatment is com-

---

[w]hen the claimant reaches maximum medical improvement and the authorized health care provider reports the claimant is able to return to work without restriction to the same job or other suitable job, and such a job is provided by the employer, or the claimant agrees he or she is able to return to work without restriction. . . .

"Return to work without restriction" is a defined term under S.C. Code Regs. 67-502(A)(4) (1990):

A statement of the authorized health care provider about the capacity of the claimant to meet the demands of a job and the conditions of employment. The determination must be made when the claimant's physical condition is static or is stabilized with or without medical treatment. The determination is appropriate when there are no physical limitations on the claimant's ability to perform the same or other suitable job as the claimant performed before the injury.

[2]This court had previously held in *Grayson*, — S.C. at —, 439 S.E. (2d) at 860, that the Commission's findings were based upon a "mistaken view of the evidence."

[3]Mullinax does not appeal the suspension of temporary total disability benefits. Accordingly, we do not address whether she is able to return to work without restriction. Rather, she argues she is either entitled to continued medical treatment or, alternatively, to payment for total disability.

pensable. *Id.* at 41, 83 S.E. (2d) at 462; Arthur Larson, *The Law of Workmen's Compensation* § 13.21(a) (1994). Additionally, new injuries resulting indirectly from treatment for the original injury are also compensable. *Id.* Likewise, a work-related accident which aggravates or accelerates a pre-existing condition, infirmity, or disease is also compensable. *Brown v. R.L. Jordan Oil Co.*, 291 S.C. 272, 353 S.E. (2d) 280 (1987); *Sturkie v. Ballenger Corp.*, 268 S.C. 536, 235 S.E. (2d) 120 (1977); *Glover v. Columbia Hospital of Richland County*, 236 S.C. 410, 114 S.E. (2d) 565 (1960) (a quiescent weakened, but not disabling condition accidentally aggravated, accelerated, or activated, with resulting disability, is compensable); Arthur B. Custy, *The Law of Workmen's Compensation in South Carolina* § 9.1 (1977). A condition is compensable unless it is due solely to the natural progression of a pre-existing condition. *Id.* It is no defense that the accident, standing alone, would not have caused the claimant's condition, because the employer takes the employee as it finds him or her. *Brown v. R.L. Jordan*, 291 S.C. at 275, 353 S.E. (2d) at 282. According to Professor Custy:

> [A]ggravation of a pre-existing condition is compensable where disability is continued for a longer time, even though no disability would normally have resulted from the injury alone, or even if the aggravation would have caused no injury to an employee who was not afflicted with the condition.

Arthur B. Custy, *The Law of Workmen's Compensation in South Carolina* § 9.1 (1977); *accord Green v. Bennettsville*, 197 S.C. 313, 15 S.E. (2d) 334 (1941).

Finally, circumstantial evidence may be used to prove causation. *Glover v. Rhett Jackson Co.*, 274 S.C. 644, 267 S.E. (2d) 77 (1980). "The causal sequence . . . may be more indirect or complex, but as long as the causal connection is in fact present the compensability of the subsequent condition is beyond question." Arthur Larson, *The Law of Workmen's Compensation* § 13.11(b) (1994). Where the evidence is susceptible of but one reasonable inference, the question is one of law for the court rather than one of fact for the Commission. *Glover v. Rhett Jackson Co.*

## `V. ANALYSIS

Mullinax basically had six different doctors evaluate and/or treat her back and urinary problems. Of these six doctors, four addressed the urinary problem. Dr. Littlepage first noted on March 5, 1991 that Mullinax "had problems with her bladder" and was in a "stage of 'bladder retraining'" from a prior hysterectomy. Noting Mullinax's bladder was not "tacked up" at the time of the hysterectomy, Dr. Littlepage nevertheless concluded: "Anyhow, I think that *this would come under a work related event related to her exercise.*" (Emphasis added.) He, therefore, referred her to Dr. Long, a urologist, for an evaluation. He also referred her to Dr. Scott, who conducted a needle electrode study, EMG, and H-Reflex study but made no mention of incontinence in his report.

Dr. Long saw Mullinax on June 5, 1991, and chronicled "fairly severe" urinary stress leaking "for the past two months" which was "getting much worse . . . During exercises she has severe leaking." He recommended urodynamic studies, but added in a follow-up note that because Crawford and Company would not pay, she had elected not to have these studies done.

Mullinax next saw Dr. Bruce, an orthopaedic surgeon, on September 3, 1991. According to his report, he reviewed Dr. Littlepage's records, including his myelogram, CAT scan, and bone scan. He agreed Mullinax had reached MMI, and found a 10 percent impairment to her back. He did not address her incontinence at all.

Dr. Rice, a urologist, saw Mullinax on November 12 and December 3, 1991, pursuant to the Commissioner's interim order. Dr. Rice is the only doctor who conducted specific tests in an attempt to evaluate Mullinax's incontinence.

As part of his evaluation, Dr. Rice performed a CMG, EMG, and IVP of the bladder. These were the same tests Dr. Long had earlier recommended but which Mullinax could not afford. Even though Dr. Rice never completed his treatment or diagnosis of Mullinax, he believed the incontinence "may have been going on before the exercise program, but may have been exacerbated by this." However, the Commissioner's final order abruptly ended his evaluation. In fact, his final note says "[r]ecommend Ditropan . . . patient to call back in two weeks."

Dr. Trent, an orthopaedist, also evaluated Mullinax pursuant to the Commissioner's request. He saw her on November 15 and noted "she is developing a neurogenic bladder over the past few months." He reviewed her myelogram and CT scan which he felt showed "a fairly significant 4-5 central disc, quite possibly getting that left nerve root," but opined he would:

> like to rule out lower cord problems before we proceed with any further discussion of lower back difficulties or surgical decompression of these nerve roots. I think the next thing to get involved would be a neurologist to rule out the possibilities of some central neurological problem because what I see on these x-rays does not explain the neurogenic bladder.

He then ordered an MRI.

Dr. Trent was the last doctor to evaluate Mullinax prior to the Commissioner's final order. He said:

> MRI shows a central right-sided 5-1 disc bulge. Her leg paid is left-sided. She only has the low back pain. She has a neurogenic bladder documented by studies done by Dr. Rice. I cannot explain this. This lady needs to see a neurologist and will schedule this appointment for her. *At this point in time further treatment for her back would pend resolution of this neurogenic bladder situation.* I do not think she needs surgery. I certainly think that she needs work-up by a neurologist. See back here after this work-up is done. Still unfit for duty.

(Emphasis added.)

The single Commissioner, whose findings were adopted by the Commissioner, found no causal relationship between Mullinax's incontinence and her work-related injury. He based his opinion in part on the failure of Dr. David Rice, a urologist, to proximately link the incontinence to the injury. However, as noted, when the Commissioner entered his final order, Dr. Rice was still actively and aggressively seeking to discover the cause of Mullinax's incontinence. As late as December 3, 1991, Dr. Rice had prescribed medication for the problem and had scheduled her for further evaluation.

Furthermore, in his November 12, 1991 report to the Commission, Dr. Rice stated:

[t]he fact that Dr. Littlepage stated that there had been some bladder problems on 3-5-91 prior to starting the physical therapy . . . makes me think this problem may have been going on before the exercise program, but may have been exacerbated by this.

The Commissioner also based his opinion concerning the lack of a causal relationship between the bladder problems and the injury on the testimony of Barbara Elizabeth Dawson.[4] Dawson, who never examined, evaluated, or treated Mullinax, testified only "it was common" for women of Mullinax's age and gynecological history "to develop stress incontinence when they get a little older in life." She acknowledged stress incontinence may be brought on by exercise "[i]f a person is predisposed to it. . . ." Her testimony does no more than establish the possibility that Mullinax's medical condition, especially her prior hysterectomy, made her more susceptible to incontinence. The essence of her testimony is best summed up by her response to a question asked her on cross-examination:

Q. All right. So what you're just saying is the stress incontinence can be caused by any number of things. Is that what you're saying?
A. Yes.

On the other hand, Mullinax testified she was having no health problems at the time of the accident and that she first started having bladder problems approximately five days after the accident. She further said that when she first saw Dr. Littlepage on March 5, 1991, she told him she was having problems with her bladder, "that I wet myself a little bit, but I wasn't sure you know, why." As indicated earlier, Dr. Littlepage noted on this first visit she was in a stage of "bladder retraining" because of a previous hysterectomy. However, later, in a May 8, 1991, notation, he said she began to have stress urinary incontinence "[w]hen she started doing her exercises" and "[i]t has progressively gotten worse." He also noted the staff at the Pain Therapy Center had told Mullinax

[4] Although the Commissioner's order refers to the testimony of Bonnie Davis, he clearly meant to refer to Dawson before Bonnie Davis did not testify.

to get the incontinence "fixed that day," but that "people that do physical therapy don't understand the mechanics of the bladder" and that it "couldn't be repaired in one day."

Although an inference may be drawn from Dr. Littlepage's report and Dawson's testimony that Mullinax may have suffered from incontinence to some degree before the accident, all of the evidence shows that, the accident or the exercises, a natural consequence of the accident, at a minimum aggravated the incontinence.[5] *See Rains v. Ford Motor Co.,* 158 Ga. App. 808, 282 S.E. (2d) 346 (1981) (while the claimant had certain urological and gynecological problems before the injury, they manifested themselves in aggravated force soon after the injury and were thus compensable).

The Commission committed legal error when it based its decision solely on the lack of a medical opinion stating Mullinax's injury caused the incontinence. In doing so, it ignored the medical and circumstantial evidence in the record, which shows either the injury or the treatment for the injury aggravated the incontinence. This is true even though Mullinax may have suffered some degree of incontinence before the injury, and even though her prior medical history made her condition more susceptible to aggravation by the injury or its treatment. Both circumstantial evidence and lay testimony are competent in worker's compensation cases if the injury and disability can be reasonably connected through their use. *Aristizabal v. I.J. Woodside-Division of Dan River, Inc.,* 268 S.C. 366, 234 S.E. (2d) 21 (1977).

The dissent would hold Dr. Littlepage's report is substantial evidence supporting the Commission's finding that Mullinax's incontinence was not related to the accident. However, Dr. Littlepage, a neurosurgeon, performed no tests for incontinence. HIs note that Mullinax's gynecologist did not perform a bladder tack-up at the time of her hysterectomy does not amount to substantial evidence of the cause of her incontinence or whether or not the injury directly or indirectly ag-

---

[5] We do not believe the record reveals any uncertainty about the causal connection between Mullinax's work related injury and the aggravation of her incontinence, but if there is any, it was caused by Winn-Dixie's refusal to pay for the urodynamic studies recommended by Dr. Long and the Commission's actions in determining the claim while the court-appointed doctor was still attempting to determine the etiology of the incontinence.

gravated it. Dr. Littlepage referenced her hysterectomy as part of her case history, not as an opinion on the cause of her incontinence. As a matter of fact, he later referred her to Dr. Long for an assessment of the problem, noting in a May 8, 1991, note that "she states that this [incontinence] came on as a result of her exercises." Moreover, as discussed above, he finally concluded the incontinence was work related because it was caused by the exercises.

The dissent also finds Dawson's testimony supplies substantial evidence to support the Commission's finding concerning Mullinax's incontinence. However, Dawson never examined, evaluated, or treated Mullinax. She testified her job was to "make sure that clients or patients, if you want to call them that, receive the best medical treatment, the appropriate medical treatment and get to the point that they can return to their normal lifestyles as soon as possible." In fact, Dawson never even met with Mullinax until June 3, the day the Commission found she reached MMI.

All the evidence in the record shows Mullinax's incontinence was aggravated by either the injury or the treatment for the injury. Because the Commission erred by finding no causal connection between the aggravation of Mullinax's incontinence and her job-related injury, it never reached the questions of the degree of disability caused by the incontinence, or whether further medical treatment for the incontinence would tend to lessen any degree of disability associated with it. It would be improper for us to decide these issues. *See South Carolina Baptist Hosp. v. South Carolina Dep't of Health & Envtl. Control*, 291 S.C. 267, 270, 353 S.E. (2d) 277, 279 (1987) ("It would be premature for a court to decide the merits of a dispute when the agency responsible for making the decision has not yet had an opportunity to decide the merits of the case."); *Hoxit v. Michelin Tire Corp.*, 3044 S.C. 461, 405 S.E. (2d) 407 (1991) (the Commission, not the appellate court, is the sole factfinder in workers' compensation cases).

## VI. CONCLUSION

In conclusion, the Commissioner's finding that Mullinax's bladder condition was not linked to her injury is wholly unsupported by the evidence. As stated in *Edwards v. Pettit Construction Co.*, 273 S.C. 576, 579, 257 S.E. (2d) 754, 755

(1979) (cited in *Glover v. Rhett Jackson Co.*), "[w]hile a finding of fact of the Commission will normally be upheld, such a finding may not be based upon surmise, conjecture, or speculation, but must be founded on evidence of sufficient substance to afford a reasonable basis for it." The only evidence in the record shows that Mullinax's incontinence was caused or aggravated by either the injury or its treatment. Therefore, the incontinence is related to the accident as a matter of law.

For the reasons stated, the finding of the circuit court that a causal condition between the incontinence and the injury exists is affirmed. We, therefore, remand the case to the Commission for proceedings consistent with this opinion. On remand, we direct the Commission to determine two issues. First, the Commission shall determine whether Mullinax's incontinence continues to require medical treatment and, if so, her entitlement thereto. Second, if it is determined that additional medical treatment wills not tend to lessen the period of any disability from incontinence, or that she has reached maximum medical improvement for the incontinence, the Commission shall determine whether Mullinax's disability rating should be revised to reflect additional disability because of the incontinence. The Commission may take additional evidence and order additional medical evaluations as needed.

Affirmed.

CURETON, J., concurs.

GOOLSBY, J., dissents in a separate opinion.

GOOLSBY, Judge (dissenting):

I respectfully dissent, believing there is substantial evidence on the whole record that the claimant reached maximum medical improvement and sustained a twenty percent permanent disability to her back for which she received compensation. The finding of maximum medical improvement took into account any question of whether the claimant's back injury or the treatment given the claimant for the injury either caused or aggravated an incontinence condition. *See Ancrum v. Low Country Steaks*, 317 S.C. 188, 452 S.E. (2d) 609 (Ct. App. 1994) (wherein, among other things, the court of appeals held, as it reversed the circuit court, substantial evidence on the whole record supported the commission's finding

that the claimant, who had suffered a back injury, had reached maximum medical improvement).

Although in Part II of its opinion the majority makes mention of the standard of review prescribed by the South Carolina General Assembly in S.C. Code Ann. § 1-23-380(A)(6) (Supp. 1994), it effectively fashions, as it picks through the testimony and exhibits, crediting this and discrediting that, weighing this an not weighing that, a wide-open, liberal standard of review that turns the prescribed standard of review on its head. This new standard of review permits an appellate court to set aside findings made by an administrative agency when the appellate court disagrees with an agency's decision not to credit certain evidence, whether the evidence is expert or otherwise, direct or indirect. For that is exactly what the majority has done here in holding "the [c]ommission committed legal error" in 'bas[ing] its decision solely on the lack of a medical opinion" and in "ignor[ing] the medical and circumstantial evidence in the record. . . ." This liberal standard of review, if allowed to stand, will come back to haunt appellate courts. It was provide an appellate court that disagrees with an administrative agency's decision with a vehicle to reach the opposite result, despite what other evidence in the record may show and despite the express injunction contained in section 1-23-380(A)(6) that "[t]he [appellate] court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact."

Only recently, the South Carolina Supreme Court, in full recognition of the narrow, conservative standard of appellate review of administrative decisions, declared in an opinion authored by Justice Toal that "[a] reviewing court may not substitute its judgment for that of the Commission as to the weight of the evidence on questions of fact." *McGuffin v. Schlumberger-Sangamo*, 307 S.C. 184, 186, 414 S.E. (2d) 162, 163 (1992). In an opinion authored earlier by Justice Chandler, in which he quoted from *Ellis v. Spartan Mills*, 276 S.C. 216, 219, 277 S.E. (2d) 590, 591 (1981), the supreme court cautioned reviewing courts that " '[i]t is not the task of courts to weigh the evidence as found by the [C]ommission.' " *Ross v. American Red Cross*, 298 S.C. 490, 492, 381 S.E. (2d) 728, 730 (1989). Most recently, in *Parsons v. Georgetown Steel*, — S.C. —, 456 S.E. (2d) 366 (S.C. Sup. Ct. 1995) (Davis Adv. Sh. No. 6 at 5),

the supreme court rejected the argument of a disappointed claimant that the commission erred in giving "great weight" to the testimony of a doctor who was not the treating physician and who made conclusions concerning the claimant's psychiatric problems allegedly before he was aware of the claimant's work related injury. *Id.* at —, 456 S.E. (2d) 366. In so holding, the supreme court stated "[t]he credibility and weight of the doctor's testimony is for the trier of fact." *Id.*

Is there substantial evidence that the claimant had reached maximum medical improvement? There is. S.R. Littlepage, M.D., wrote on June 3, 1991, in a "neurosurgical follow up note," which he copied to "Dr. Woody Long," among others, the claimant had returned to his office and he felt "she ha[d] reached maximum medical improvement."[1] George R. Bruce, M.D., who examined the claimant on September 3, 1991, *at the request of her own attorney*, also found, after reviewing her medical records,[2] the claimant "ha[d] reached maximum medical [improvement]."[3]

Is there substantial evidence that the claimant's incontinence problem did not result from the accident or the treatment for the accident? There is.[4] Dr. Littlepage wrote on

---

[1] In a report dated two days later, Dr. Long merely restated the claimant's complaint about incontinence during exercises. He drew no conclusions about the claimant's claimed incontinence being somehow connected to her work injury.

[2] Dr. Bruce's report states he waited for the claimant's medical reports before dictating his conclusions about her condition and about whether she had reached maximum medical improvement. I refuse to believe the claimant's own lawyer would not have made certain the doctor had all information necessary to do his evaluation, particularly any medical records favorable to the claimant.

[3] Interestingly, Dr. Bruce, whose report is dated September 3, 1991, the date that he states he saw the claimant, indicated "[t]he patient's chief complaint today is back pain with radiation down both legs when she does any standing." His report makes no mention of incontinence.

[4] The burden, of course, was on the claimant to show that her pre-existing infirmity or diseased condition was aggravated by the injury complained of. *Cross v. Concrete Materials*, 236 S.C. 440, 114 S.E. (2d) 828 (1960). Winn-Dixie had no burden to show the claimant's treatment *did not* aggravate her pre-existing condition.

The majority opinion mentions Dr. David Rice's observation in his office notes that the claimant's bladder problem "may have been exacerbated by [the exercise program]." This evidence, even when read in the context of the notes, is a far cry from what is necessary to establish a causal tie between the accident and the claimant's subsequent injury. In order to establish a causal connection between an accident and a subsequent injury, the opinion of a medical

March 5, 1991, in a "neurosurgical note" that the claimant "has had problems with her bladder and has had a hysterectomy" and that the claimant "is currently in a stage of 'bladder retraining' because of her hysterectomy" and "has not appreciated any change in her bladder function since her surgery." The testimony of Barbara Elizabeth Dawson, a registered nurse with thirty years experience, also provides substantial evidence that the claimant's incontinence problem resulted from something other than the accident or its treatment.[5] Furthermore, the burden was on the claimant to prove otherwise by the greater weight of the evidence and to do so to the satis-

---

expert must be at least that the disability "most probably" resulted from the accidental injury. *Cross*, 236 S.C. at 442, 114 S.E. (2d) at 829. Here, Dr. Rice noted several factors that could have contributed to this particular claimant's incontinence problem, including the claimant's prior pregnancies, moderate obesity, and hysterectomy. The single commissioner's finding that "Dr. Rice, the [u]rologist, does not proximately link the [c]laimant's bladder condition to her work related injury," therefore, is not unfounded.

One further note about Dr. Rice. The majority says on "December 3, 1991, Dr. Rice had prescribed medication for the [incontinence] problem and had scheduled [the claimant] for further evaluation." The single commissioner made his decision on February 10, 1992, more than two months later. Apparently, the "active[] and aggressive[]" effort of Dr. Rice, as the majority describes it, "to discover the cause of [the claimant's] incontinence" did not result in his filing any additional medical report. If Dr. Rice issued a report subsequent to December 3, 1991, the record does not reflect the claimant made any attempt to ask the single commissioner to consider it. The single commissioner's finding that "Dr. Rice, the [u]rologist, does not proximately link the [c]laimant's bladder condition to her work related injury," was not, as the majority suggests, unreasonable under the circumstances.

[5]The transcript of Barbara Elizabeth Dawson's testimony reflects the following:

Q. [Employer's Counsel] Based then on your education and your experience and your review of the medical files and your dealings that you've had with [the claimant], assuming all of her physical characteristics, medical history such as you had, knowing the direct history of hysterectomy—the history of hysterectomy in October 1990 and your testimony in particular that no bladder tack was done; the question to you is whether or not you have an opinion as to the probable cause of the stress incontinence that she experiences?

. . . .

A. It's common for a woman of that age with three (3) pregnancies to have a bladder suspension as well as a rectocele because it is a common occurrence for women of that age to develop stress incontinence when they get a little older in life. Usually while physicians are there if there's any indication, they'll go ahead and do a bladder tack and it's called on EMP repair.

faction of the commission, not this court.[6] *Frady v. Pacific Mills*, 231 S.C. 601, 99 S.E. (2d) 398 (1957); *see Shealy v. Algernon Blair, Inc.*, 250 S.C. 106, 156 S.E. (2d) 646 (1967) (only the commission can pass upon the weight of the evidence in a workers' compensation case).

At any rate, I adhere to the previous majority opinion, an opinion in which the late Judge Randall T. Bell concurred fully. *Mullinax v. Winn-Dixie Stores, Inc.*, Op. No. 2176 (S.C. Ct. App. filed April 25, 1994) (Davis Adv. Sh. No. 10 at 29). What follows is a modified version of the previous majority opinion, parts of which duplicate what I have written already.

The claimant injured her back as she was lifting bags of flour and sugar from pallets while working at Winn-Dixie Stores, Inc. on February 8, 1991. The claimant thereafter began receiving workers' compensation payments.

Winn-Dixie applied to the South Carolina Workers' Compensation Commission on June 19, 1991, to stop compensation payments to the claimant. On June 3, 1992, the commission filed an order adopting the order of the single commissioner, who found the claimant had suffered a twenty percent permanent partial disability to her back and had reached maximum medical improvement on June 3, 1991.

An appeal by the claimant to the circuit court resulted in a reversal of the commission's order. The circuit court found the commission's order was not supported by substantial evidence. On appeal, Winn-Dixie argues the commission's findings are supported by substantial evidence and the circuit court therefore erred in reversing the commission. I agree.

Dr. Littlepage, of Neurosurgical Associates in Greenville, began seeing the claimant in March, 1991. Dr. Littlepage per-

---

[6] On May 8, 1991, a month or so before Dr. Littlepage found the claimant had reached maximum medical improvement, he mentioned in a neurosurgical follow up note the claimant "had a hysterectomy a year ago, and at that time there was no bladder tack-up performed by her gynecologist." He also stated "I think that this would come under a work related event related to her exercise" and he would "see her back in three weeks." What he does not state at this time is that the incontinence "most probably" was connected to the injury.

Again, on June 3, 1991, Dr. Littlepage found the claimant had reached maximum medical improvement. He also found she had sustained a five percent impairment of the whole person. The commission could have concluded from these findings that Dr. Littlepage took into consideration any aggravation of the claimant's pre-existing bladder problem.

formed a CT scan and myelogram and found no evidence of a ruptured disc. Dr. Littlepage also noted in his medical report dated March 5, 1991, that the claimant was "in a stage of 'bladder retraining' because of her hysterectomy." The claimant had undergone a total hysterectomy in October, 1990, four months prior to the accident. Dr. Littlepage referred the claimant to the Pain Therapy Program in Greenville on April 3, 1991. On May 8, 1991, Dr. Littlepage noted the claimant began having stress urinary incontinence while participating in an exercise program. He also indicated her gynecologist did not perform a bladder tack-up at the time of her hysterectomy. When he released the claimant from his care on June 3, 1991, Dr. Littlepage felt she had reached maximum medical improvement and had suffered a five percent impairment of the whole person.[7]

The claimant underwent physical therapy at the Pain Therapy Center in Greenville. She was, however, discharged from the center on May 30, 1991, for poor attendance and noncompliance with the program. The claimant claimed her incontinence was aggravated by the therapy exercises.

In May, 1991, the claimant returned to work at Winn-Dixie under a Temporary Alternative Duty program and was scheduled to work two four-hour shifts per week in the delicatessen. The claimant, complaining of continuing back pain, did not complete this program.

Dr. Bruce, an orthopaedic surgeon, examined the claimant on September 3, 1991, and found no evidence of a herniated disc. Dr. Bruce, like Dr. Littlepage, felt the claimant had reached maximum medical improvement; however, unlike Dr. Littlepage, Dr. Bruce gave the claimant a ten percent physical impairment to her back.

Nurse Dawson viewed the claimant's bladder problems as resulting from three pregnancies and from not having her bladder tacked when she underwent a hysterectomy in 1990.

In November, 1991, Commissioner Marvin Kittrell ordered independent evaluations by a urologist, Dr. J. David Rice, and an orthopaedist, Dr. Carol G. Trent. Dr. Trent examined the claimant and "looked at her myelogram and CAT scan," which

---

[7]Dr. Littlepage could not give a specific percentage of impairment to the claimant's back.

revealed "a fairly significant 4-5 central disc." Dr. Trent then conducted an MRI, which revealed "a central right-sided 5-1 disc bulge." Dr. Trent concluded the claimant was unfit for duty. Dr. Rice reported there were a umber of factors that could contribute to the claimant's incontinence, but he also indicated the incontinence "may have been going on before the exercise program, but may have been exacerbated by [it] [sic]." Subsequently, Dr. Rice reported that certain symptoms were consistent with a neurogenic abnormality, as opposed to stress urinary incontinence that might be more likely associated with the claimant's obesity, past hysterectomy, or inactivity.

The commission considered all of the medical evidence[8] and other testimony[9] and concluded the claimant's bladder condition was unrelated to the accident, the claimant reached maximum medical improvement on June 3, 1991, and the claimant suffered a twenty percent permanent partial disability to the back. There is substantial evidence to support the commission's findings. *See* S.C. Code Ann. § 1-23-380(A)(6) (Supp. 1994) (a court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact); *Lark v. Bi-Lo, Inc.,* 276 S.C. 130, 276 S.E. (2d) 304 (1981) (a court may not disturb findings of the commission that are supported by substantial evidence).

Where there is conflicting medical evidence, as in this case, the findings of fact of the commission are conclusive. *E.g., Hoxit v. Michelin Tire Corp.,* 304 S.C. 461, 405 S.E. (2d) 407 (1991); *Solomon v. W.B. Easton, Inc.,* 307 S.C. 518, 415 S.E. (2d) 841 (Ct. App. 1992); S.C. Dig. (2d) *Workers' Compensation* Key No. 1939.3 at 621 (1992). This court ought to follow this rule.

---

[8]The single commissioner expressly notes in his order he asked the claimant "to undergo two (2) additional independent medical evaluations" by Dr. Rice and Dr. Trent. He also expressly notes he received reports from the two doctors, "reports" of Dr. Rice "from November 12, 1991, through December 3, 1991," and "report" of Dr. Trent "from November 15, 1991, through December 6, 1991."

[9]Before making his findings of fact, the single commissioner recites he had reviewed the evidence, considered "the medical evidence and lay testimony," and gave "liberal weight to [the claimant's] evidence of back pain and limitation of lifestyle activities."

I would reverse.