**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Timothy Causey, Appellant,

v.

Horry County, Self-Insured Employer through the S.C. Counties Workers' Compensation Trust, Respondents.

Appellate Case No. 2017-001732

―――――――――

Appeal From The Workers' Compensation Commission

―――――――――

Opinion No. 2022-UP-002
Submitted October 1, 2019 – Filed January 5, 2022
Withdrawn, Substituted, and Refiled June 21, 2022

―――――――――

**REVERSED AND REMANDED**

―――――――――

Francis A. Humphries, Jr. and William Henry Monckton, VI, both of Monckton, Hembree & Humphries, PA, of Myrtle Beach, and Allison Paige Sullivan, of Bluestein Thompson Sullivan LLC of Columbia, for Appellant.

Roy Allen Howell, III and Kirsten Leslie Barr, both of Trask & Howell, LLC, of Mt. Pleasant for Respondents.

―――――――――

**MCDONALD, J.:** The statutory dependents of Horry County Sheriff's Deputy Timothy Causey appeal the decision of the Appellate Panel of the South Carolina

Worker's Compensation Commission denying death benefits.  We reverse and remand.

Deputy Causey died two months after working three twelve-hour shifts on the perimeter of a large structure fire in the Carolina Forest area of Horry County.  The fire was massive; it destroyed 26 buildings, each containing four residential units.  Jerry DelPercio, a fellow deputy who lived at the complex and helped evacuate the area, described seeing "trees on fire about 50, 60 feet high" and hearing sounds "like a war zone.  There [were] explosions, red smoke, black smoke, whatever you can think of."  All of the buildings "were engulfed within 20 minutes because of the wind."  Although authorities were able to extinguish the fire by the following day, heavy smoke remained in the area for several days.

The Sunday morning after Deputy Causey's first night shift at the fire, Donna Causey observed her husband had "watery eyes, [a] runny nose, coughing, red eyes, [and] he kept rubbing his eyes."  After his return from the area of the fire the second day (Monday morning), Donna observed black discharge on the tissue when Deputy Causey blew his nose, and his eyes were "really red, almost swollen."  Upon Causey's return Tuesday morning, "he coughed up and showed me on the tissue, and it was a yellowish black color.  Blew his nose again, it was a black color.  The eyes were really red.  The nose was constantly draining.  Coughing more on Tuesday morning."

Causey did not return to work for his regular day shift Tuesday or Wednesday.  On Thursday, Donna took her husband to Loris Family Health Clinic.  Following blood work, a chest X-ray, and a breathing treatment, the clinic provided an antibiotic and sent Deputy Causey home.  The following day, Causey was unable to drink Diet Pepsi, as he could only handle water or Gatorade due to the condition of his throat.  By Saturday, Causey "was gasping with his head down.  He just had this ashen look and this bluish color."  At that point, Donna took Causey to the emergency room at McLeod Medical Center.  Causey was hospitalized at McLeod, but as his condition continued to worsen, he was airlifted to MUSC on March 27.  At MUSC, Causey was diagnosed with acute respiratory distress syndrome (ARDS), secondary to H1N1, also known as swine flu.  Causey died at MUSC on May 19; his MUSC death summary provides, Causey died from "hypovolemic shock, secondary to diffuse alveolar hemorrhage, secondary to ventilator-assisted pneumonia, secondary to prolonged intubation, and secondary to smoke inhalation injury with H1N1 influenza."  Deputy Causey's death certificate lists his cause of death as "diffuse alveolar hemorrhage, due to ventilator associated pneumonia, due to prolonged intubation, due to smoke inhalation injury."

A number of Deputy Causey's physicians were deposed as to his cause of death, and both Causey and Respondents presented expert opinions, either through live testimony, deposition, or sworn statement. Despite the evidence in the record from several treating physicians, the findings on Deputy Causey's death certificate, the MUSC death summary, and the live testimony of Dr. Kim Collins, the Appellate Panel reversed the Single Commissioner's award of death benefits and found the claimant

> has shown nothing more than that one could speculate smoke exposure on March 16, 2013 could have caused some ill-defined injury to Causey's lungs, and that if one so speculates, one could further speculate that such an injury could have impacted Causey's ability to fight a deadly flu virus. But such speculation is insufficient. Without actual evidence that Causey sustained an injury to his lungs on March 16, 2013 and that such injury to his lungs was the proximate cause of his death, he is not entitled to benefits under S.C. Code Ann. § 42-9-920 as a matter of law.[1]

In reaching this conclusion, the Appellate Panel relied upon its finding that "[no opinion of any doctor who actually treated Causey supports a finding that Causey sustained any injury due to his alleged smoke exposure." This finding, in addition to the Panel's opening statement that four of Deputy Causey's treating physicians agreed "smoke exposure **played no role**" in Causey's death" mischaracterized Dr. Charlton Strange's testimony.[2]

---

[1] The Appellate Panel's "actual evidence" language here—when read in conjunction with the testimony of the treating physicians discussed below—suggests the Panel erred at the outset of its analysis by imposing an "objective evidence" standard to Deputy Causey's claim. *See Russell v. Wal-Mart Stores, Inc.*, 426 S.C. 281, 288, 826 S.E.2d 863 (2019) (in which our supreme court noted this court's reversal focusing on the Commission's error "in requiring a change of condition to be established by objective evidence.").

[2] More precisely, the Appellate Panel found "Causey's attending physician, Dr. Charlie Strange, testified that Causey died from Swine Flu and that smoke exposure **played no role in his death**. In this opinion, Causey's other treating physicians (Dr. Timothy Whelan, Dr. William Largen, and Dr. Dee Ford), concurred." (Emphasis added). While it is true that these physicians agreed with

Dr. Strange was the admitting physician upon Causey's transfer from McLeod to MUSC. Dr. Strange explained in his deposition that "the impression of the McLeod physicians was that this was smoke inhalation, but they had also given [Causey] antibiotics for the possibility that there was bacterial infection that was also present." More sophisticated testing than was available at McLeod revealed the presence of H1N1, and MUSC began treatment with Tamiflu. Initially, Dr. Strange testified that he did not believe smoke inhalation contributed to Causey's death as "it is really the H1N1 that set up all the subsequent events." However, he immediately clarified this statement by explaining smoke inhalation, if it were an issue, "could have increased his chance of acquiring clinical H1N1 and made his clinical course more severe." When asked whether it was his opinion to a reasonable degree of medical certainty that the H1N1 was "basically the sole cause of his ARDS and ultimately his death," Dr. Strange replied:

> That's a hard one. There's pretty big literature out there that shows that cigarette smokers have more H1N1 than people that don't smoke and that the H1N1 that they do acquire is more serious than people that are nonsmokers. And because Mr. Causey was a nonsmoker, we could speculate but not prove that the smoke inhalation that he did have made his presentation of H1N1 worse than it otherwise would have been.

When asked whether he could state his opinion to a reasonable degree of medical certainty, Dr. Strange responded, "There is a possibility but not rising to the level of medical probability that the smoke inhalation contributed in a meaningful way to his ultimate outcome." This is contrary to the Appellate Panel's characterization of this testimony as concluding "smoke inhalation played no role in his death."

The Panel's summation of Dr. Whelan's testimony is likewise concerning as it did not acknowledge Dr. Whelan's recognition of the possibility of smoke inhalation playing a role in Deputy Causey's death. Dr. Whelan noted Deputy Causey suffered "severe ARDS, multiple complications with a prolonged ICU stay." He developed multiple infections, including "bacterial ventilator associated pneumonias" and a possible fungal infection. While Dr. Whelan agreed he could

Dr. Strange's statements as conveyed to them, the Appellate Panel's finding ignores the context and clarification Dr. Strange, Dr. Whelan, and Dr. Ford provided in their full testimony.

not state to "a reasonable degree of medical certainty that the smoke inhalation played any role" in Causey's death, he emphasized the reverse was also true:

> So, I agree with your interpretation. However, I think if one asked the question in the reverse, can you say to a reasonable degree of medical certainty that a significant smoke inhalation exposure around the time that one is infected with H1N1 has absolutely no impact on the disease course, I would also say I cannot say that to a reasonable medical certainty.

He explained, "I . . . think it is very difficult to know, based on the records that I reviewed, the extent of the smoke inhalation itself and if there could have been any contribution of smoke inhalation to susceptibility to H1N1."Notably, Dr. Whelan was the attending physician who signed off on Deputy Causey's death summary. In discussing the death summary in his deposition, Dr. Whelan explained he would redact only the word "injury" from the final line of the summary, and he could not opine about "smoke inhalation" to a reasonable degree of medical certainty.[3]

Dr. Dee Ford was Causey's attending physician in the medical intensive care unit at MUSC. She, too, found the death summary reasonable as to the cause of Deputy Causey's death. However, when asked whether she had the medical documentation and history necessary to opine to a reasonable degree of medical certainty as to whether Deputy Causey suffered a smoke inhalation injury, she agreed she did not have the information necessary to so opine. She noted she would need a more detailed occupational exposure history, and she agreed that once H1N1 was diagnosed, other concerns would take a "backseat" because "[o]nce H1N1 were identified in a patient with Mr. Causey's constellation of signs and symptoms, his illness would be attributed to H1N1."

Finally—and of significance to our consideration of the Appellate Panel's order— Dr. Nicholas Pastis testified by deposition as to his treatment of Deputy Causey at

---

[3] Dr. William Largen, the MUSC ICU resident who dictated and completed the death summary co-signed by attending physician Whelan, was not deposed, but his statement is included in the record. Dr. Largen stated, in pertinent part, that he "would defer any opinions regarding Mr. Causey's death to those of Dr. Whelan and Dr. Strange. I would also agree that the ultimate cause of Mr. Causey's death was complications of Acute Respiratory Distress Syndrome secondary to H1N1 Swine Flu."

MUSC.  Dr. Pastis's deposition testimony was Claimant's Exhibit 1 before the Single Commissioner.  In the deposition, Dr. Pastis was asked:

> Q.  So is there any way to state, within a reasonable degree of medical certainty, that the smoke inhalation that allegedly occurred in this case had anything to do with his death?
>
> A.  I think that I can say with a reasonably - - reasonable degree of certainty, that it made his ability to fight off an infection worse.

Although Dr. Pastis admitted on cross-examination that this opinion would require some degree of speculation as to the presence of a burn injury to Causey's airway, he was careful to note, "I would be uncomfortable saying that it [the smoke inhalation] had nothing to do with his death."  And he later clarified evidence of a burn injury would be required only if one needed "absolute proof."  Upon hearing the summary of Causey's appearance and symptoms following each of his three nights at the fire perimeter, Dr. Pastis agreed the symptoms were consistent with an inhalation injury.  As to the severity of H1N1 and an alleged MUSC communication to Donna Causey that "the smoke inhalation would have made it difficult for [Causey] to fight it [H1N1] off," Dr. Pastis explained that while H1N1 is severe, "most people don't die of this disease.  He certainly had a severe case.  Those happen without smoke inhalation.  But in his case, the timing of it made me think that it exacerbated what was already a severe problem and made it worse."[4]

Like Dr. Ford, Dr. Pastis agreed the cause of death as set forth in the MUSC death summary was one "to which [he] would ascribe."  On cross-examination, Respondents asked Dr. Pastis whether "H1N1 is the cause of death of [Causey's] acute respiratory distress syndrome?"  His response: "It - - it is a cause."  However, in reversing and vacating the Single Commissioner's order, the Appellate Panel declared Dr. Pastis's opinions as to causation "are not only equivocal, they are admittedly based upon nothing more than speculation."

---

[4] Dr. Pastis also referenced the literature indicating a pulmonary infection can be made worse by damage to the airway.  For example, "if you have a bad inhalation injury and you get a pneumonia, it is reasonable that it may be worse than somebody who didn't have the inhalation injury."

Deputy Causey's retained expert was Dr. Kim Collins, the former Chief Medical Examiner and Director of Autopsy and Forensic Pathology at MUSC. When asked about her opinion regarding Deputy Causey's injuries and the proximate cause of his death, Dr. Collins, who is board certified in anatomic, clinical, and forensic pathology, replied:

> My opinion is this was a healthy young man until he experienced three days of smoke inhalation, and that [led] to what we call an inhalation injury which [led] to acute lung injury. And in that process, his immune system−particularly in the lungs that help you fight off what you're breathing in, all the germs, etcetera−during this time he developed H1N1 influenza, influenza A. Secondary to developing influenza, he had secondary bacterial infections, such as Klebsiella, pseudomonas, and then those cause a pulmonary hemorrhage. So he actually dies of the pulmonary hemorrhage and the bacterial infections due to the H1N1 influenza, due to the smoke inhalation.

Dr. Collins then discussed the category of fire deaths resulting from inhalation injury and "the cascade of events because of the systemic problems this can create and the metabolic problems it can create. And so you have acute lung injury, which develops into ARDS, which then can develop into multi-organ failure and secondary infections." In Dr. Collins's opinion, "to a reasonable degree of medical certainty," the underlying cause of death for Deputy Causey was "the smoke inhalation." Dr. Collins explained this is

> my medical opinion, more likely than not, that but for this man [having] been involved in this fire and inhaled these chemicals these three days, but for that occurring, he could not have developed H1N1. And this is my opinion if you look at the history, you look at the scenario, the chronology, the events follow perfectly. Acute lung injury from smoke inhalation, ARDS acute respiratory distress syndrome, H1N1, and then you get your secondary bacterial infections, and your hemorrhage into your lungs.

On cross-examination, Dr. Collins agreed that because no autopsy was conducted, there was no objective medical evidence to identify specific smoke inhalation damage to Deputy Causey's lung tissue. According to Dr. Collins, Deputy Causey contracted H1N1 because of the destruction to his lungs, "because of the inhalation injuries, not because it [H1N1] was inside the smoke." On redirect, Dr. Collins explained "[m]ost people have a very mild flu when they have H1N1 and this was not the case because he was compromised by the smoke inhalation injury." When asked whether this was her opinion to a "reasonable degree of medical certainty more likely than not," Collins replied "Yes, it is. Most certainly."

Again, the Appellate Panel characterized Dr. Collins's testimony as speculative, noting she and Dr. Pastis "both were forced to concede that their opinions were based, not on objective medical evidence, but only speculation." The Panel order further misstates her testimony, finding, "In fact, Dr. Collins was forced to concede that she did not even understand the nature of Causey's alleged exposure to smoke, believing him (falsely) to have been actually fighting a fire for the three 12-hour shifts." However, a review of this portion of the Collins deposition transcript actually establishes that when she was asked about her file note indicating Deputy Causey was "involved in fighting an apartment fire," Dr. Collins responded, "I don't know what his role was during the fire. He might have been fighting the fire - - apartment fire - - or he might have been assisting in keeping the barriers. I am not sure . . . . He was exposed to the soot and to the fumes. It doesn't really matter what he was doing at the time." Dr. Collins then explained that unlike properly equipped firefighters, "security personnel may not have the proper respiratory equipment" and Causey was involved in the area of the fire for "[t]hree 12-hour shifts."

Appellant concedes, as she must, that the various doctors—the treating physicians and Respondents' medical expert witnesses—gave different and, at times, contradictory, opinions regarding the severity of H1N1 in an otherwise healthy individual and the problems a smoke inhalation injury could cause in complicating or exacerbating a patient's ability to fight off respiratory infections.[5]

_____

[5] For example, in a 3/21/2013 note from McLeod, Dr. Barnard reported, "Deputy Causey is a 50 year old male who has been very, very healthy. He was involved in security with regards to the quite large apartment and forest fire in Myrtle Beach a couple or so weeks ago." Records from McLeod note Causey's "progressive deterioration" and his elective intubation. Upon the transfer to MUSC, Dr. Barnard wrote in Causey's discharge summary: "Acute lung injury syndrome, most likely related to smoke inhalation at this particular point. Note also that he did present

Respondents submitted the written opinions of four non-treating pulmonologists, Dr. John Mitchell, Dr. Robert Galphin, Dr. Gregory Cauthen, and Dr. Thomas Sporn, Chief of Pulmonary and Thoracic Pathology at Duke University Medical Center, who reviewed Causey's medical records and "concluded that Causey did not sustain any injury as a result of smoke exposure."

On cross-examination, Donna Causey admitted the medical history given at the Loris clinic reflected her husband had been running a fever for four days when he presented at the clinic. Much was made of a statement that another family member had also been ill; however, evidence in the record indicated the Causeys' daughter was suffering from a urinary tract infection during the early days of Deputy Causey's respiratory symptoms. Also hotly disputed as hearsay was Donna's testimony that an unidentified MUSC physician told her that her husband "had smoke inhalation with H1N1, which made the entire situation what we would consider to be the perfect storm, which made it twice as bad and that he may not survive."

In addition to dismissing certain circumstantial evidence as "speculative" or categorizing it as "no evidence," the Appellate Panel failed to recognize that circumstantial evidence may be used to prove causation in a worker's compensation case. *See Glover v. Rhett Jackson Co.,* 274 S.C. 644, 649, 267 S.E.2d 77, 80 (1980). "Proof that a claimant sustained an injury may be established by circumstantial and direct evidence where circumstances lead an unprejudiced mind to reasonably infer the injury was caused by the accident." *Tiller v. Nat'l Health Care Ctr. of Sumter*, 334 S.C. 333, 339–41, 513 S.E.2d 843, 846–47 (1999). "The causal sequence . . . may be more indirect or complex, but as long as the causal connection is in fact present the compensability of the subsequent condition is beyond question." *Mullinax v. Winn-Dixie Stores, Inc.*, 318 S.C. 431, 436–37, 458 S.E.2d 76, 79–80 (Ct. App. 1995) (omission by court) (quoting Arthur Larson, *The Law of Workmen's Compensation* § 13.11(b) (1994).

In *Mullinax*, the claimant injured her back lifting heavy bales of flour, sugar, and corn meal. Although she initially sought treatment for back pain, she subsequently claimed incontinence resulted from the back injury. *Id*. at 433, 458 S.E.2d at 78. As in this case, the *Mullinax* claimant was treated by numerous physicians, but no treating physician would definitively state her incontinence, which to some extent

---

with decreased white count and decreased platelet count that may have been an inflammatory component of this process or of course could be another process of course."

pre-dated her back injury, was caused by her work injury.  Despite this, a divided Court of Appeals panel found:

> The Commission committed legal error when it based its decision solely on the lack of a medical opinion stating Mullinax's injury caused the incontinence. In doing so, it ignored the medical and circumstantial evidence in the record, which shows either the injury or the treatment for the injury aggravated the incontinence. This is true even though Mullinax may have suffered some degree of incontinence before the injury, and even though her prior medical history made her condition more susceptible to aggravation by the injury or its treatment.

*Id*. at 441, 458 S.E.2d at 82.  *See also Hargrove v. Titan Textile Co*, 360 S.C. 276, 294, 599 S.E.2d 604, 613 (Ct. App. 2004) ("If a medical expert is unwilling to state with certainty a connection between an accident and an injury, the 'expression of a cautious opinion' may support an award if there are facts outside the medical testimony that also support an award." (quoting *Tiller,* 334 S.C. at 340, 513 S.E.2d at 846)); *Grice v. Dickerson, Inc.,* 241 S.C. 225, 127 S.E.2d 722 (1962) (where medical testimony recognized the possibility of a causal connection between claimant's accident and rheumatoid arthritis but no medical testimony stated such connection to a reasonable degree of medical certainty, the Appellate Panel must weigh the facts in light of the medical possibilities and draw inferences consistent with the medical testimony in the record); *Brewer v. Charleston Shipbuilding & Drydock Co.,* 212 S.C. 43, 46 S.E.2d 173 (1948) (doctor's testimony regarding connection between claimant's accident and his subsequent fungal infection, though not stated to a reasonable degree of medical certainty, was sufficient to support an award when combined with lay testimony about claimant's health before and after the accident, despite testimony of another doctor stating there was no connection).  Here, while the record contains evidence that supports both parties' positions, the Appellate Panel reached its own proximate cause conclusion based on an erroneous understanding of the medical and circumstantial evidence.

The Administrative Procedures Act (APA) establishes the standard for our review of Commission decisions.  *Lark v. Bi-Lo, Inc.*, 276 S.C. 130, 135, 276 S.E.2d 304, 306 (1981).  "An appellate court has the power upon review to reverse or modify a decision of an administrative agency if the findings and conclusions of the agency are (1) affected by an error of law, (2) clearly erroneous in view of the reliable and substantial evidence on the whole record, or (3) arbitrary or capricious or

characterized by abuse of discretion or a clearly unwarranted exercise of discretion." *James v. Anne's Inc.*, 390 S.C. 188, 192, 701 S.E.2d 730, 732 (2010) citing *Gray v. Club Group, Ltd.,* 339 S.C. 173, 182, 528 S.E.2d 435, 440 (Ct. App. 2000); S.C. Code Ann. §1-23-380(5)(d)-(e) (Supp. 2018). "Substantial evidence is 'not a mere scintilla of evidence nor the evidence viewed blindly from one side of the case, but is evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion that [the commission] reached or must have reached' to support its orders." *Lewis v. L.B. Dynasty, Inc.*, 419 S.C. 515, 518, 799 S.E.2d 304, 305 (2017) (alteration by court) (quoting *Lark v. Bi-Lo, Inc.*, 276 S.C. 130, 135, 276 S.E.2d 304, 306 (1981)).

The deference required by our standard of review does not require us to ignore the Appellate Panel's apparent misunderstanding of the medical evidence and its relationship to the circumstantial evidence of causation in this case. Our review of the Appellate Panel's order—in conjunction with the medical records, deposition transcripts, live testimony, and submitted expert opinions—convinces us that substantial evidence does not support the Appellate Panel's findings, most notably, its statement that "[n]o opinion of any doctor who actually treated Causey supports a finding that Causey sustained any injury due to his alleged smoke exposure." *King v. Int'l Knife & Saw-Florence*, 395 S.C. 437, 443, 718 S.E.2d 227, 230 (Ct. App. 2011) (finding substantial evidence did not support the Appellate Panel's findings where it mischaracterized the claimant's injury and barred recovery of benefits for failing to satisfy the notice requirement). The Appellate Panel's factual misconceptions in recounting and analyzing the medical and circumstantial evidence anchored its causation analysis, resulting in an error of law. Therefore, we reverse the decision of the Appellate Panel and remand this matter so that the Appellate Panel may properly analyze and address the circumstantial evidence of causation in this record. The Panel should address causation in conjunction with an appropriate review of the deposition testimony and medical records of Causey's treating physicians and Respondents' reviewing experts. *See James*, 390 S.C. at 192, 701 S.E.2d at 732 ("An appellate court has the power upon review to reverse or modify a decision of an administrative agency if the findings and conclusions of the agency are . . . affected by an error of law.").

**REVERSED AND REMANDED.**[6]

**WILLIAMS, C.J., and HUFF, A.J., concu**r.

---

[6] We decide this case without oral argument pursuant to Rule 215, SCACR.