599 S.E.2d 604

**Sandra HARGROVE, Employee, Claimant,**

**v.**

**TITAN TEXTILE CO. & Perdue Farms, Inc., Employer,**

**and**

**Kemper Insurance Co. & Perdue Farms,**
**self-insured, Carrier, Defendants,**

**Of whom Perdue Farms, Inc. is the, Appellant,**

**and**

**Sandra Hargrove, Titan Textile Co. and Kemper**
**Insurance Co. are the, Respondents.**

**No. 3846.**

Court of Appeals of South Carolina.

Heard June 10, 2004.
Decided July 12, 2004.

278

Finley B. Clarke, of Florence, for Appellant.

Walter H. Barefoot, of Florence, for Respondents Titan Textile Co. and Kemper Insurance Co.

William L. Smith, II, of Columbia, for Respondent Sandra Hargrove.

ANDERSON, J.:

Perdue Farms, Inc. appeals a Circuit Court order affirming the award of Workers' Compensation benefits to Sandra Hargrove. Perdue argues the Circuit Court erred in ruling substantial evidence supported the finding by the Appellate Panel of the Workers' Compensation Commission that Hargrove aggravated or exacerbated a pre-existing condition during the course of her employment at Perdue. We affirm.

## *FACTUAL/PROCEDURAL BACKGROUND*

Sandra Hargrove is a thirty-six-year-old mother of two who resides in Dillon, South Carolina. Hargrove began working at Titan Textile Company, d/b/a Dillon Yarn (Dillon Yarn), as an inspector/packer in December of 1997. Hargrove's job at Dillon Yarn required her to remove spools of yarn from manufacturing machines and visually inspect the spools before placing them on a metal pole protruding from a pushcart. Once the spool was on the cart, she would wrap it in plastic and then, using both hands, remove the spool from the pole and place it in a box located on the pushcart. Hargrove "put together" fifty or more boxes per day.

A single box can hold any number of spools depending on the size of the particular spool being manufactured. When the cart was full, Hargrove would push it to a conveyor belt where she would unload the boxes. Hargrove testified she

made approximately forty or fifty trips per shift to the conveyor line. Her supervisor at Dillon Yarn, Effie Peele, estimated Hargrove would "handle somewhere between 600 and 800 tubes of yarn per day." During her time at Dillon Yarn, Hargrove's work schedule consisted of working eight-hour shifts, seven days in a row, having two or sometimes three days off, and then working seven more days.

Hargrove stated she never experienced problems with either of her arms before working at Dillon Yarn. However, about six or seven months after her employment at Dillon Yarn began, Hargrove started experiencing problems with her left hand and arm, including swelling and numbness. She did not seek medical attention or notify her employer when these problems first started. She testified she would go home after work and soak her hand and arm and then "it would be all right"—"[t]he pain would go away" and the "swelling would go down." According to Hargrove, this swelling would occur "as much as once a month."

On March 1, 2000, Hargrove applied for a position working first shift at Perdue Farms, a chicken processing plant. On the medical history section of her application, Hargrove was asked if she had ever "had pain, numbness, swelling in [her] hands, wrists, arms." Hargrove indicated that in the past she had problems with "soreness" due to lifting boxes at Dillon Yarn. She further noted a history of pain and swelling in her hand and wrist.

Prior to accepting an application, Perdue's practice is to give the applicant a physical to see if the individual can physically perform the job. The physical consists of a number of tests specifically tailored to the demands of the position being sought. Hargrove was given tests to ascertain her grip strength on both the right and left hands, in addition to other tests on her hands including the Tinel, Phalen and Finklestein tests. These three tests check for numbness and tingling in the hands. The Finklestein test involves physically touching the median nerve to check for tingling.

The Occupational Health Nurse at Perdue, Mary Smith Sutherland, declared all tests on Hargrove were negative. Nurse Sutherland explained that Hargrove's testing indicated

she had a strong grip in both hands and no problem taking any of the tests administered by Perdue.

Hargrove's grip strength was important because she was applying for a position in the evisceration department. Nurse Sutherland stated that, in the evisceration department, employees have to pull skin off of the chickens that are being processed. She said that, although machines have already processed the insides of the chickens, employees might have to "scoop" the remaining entrails from the bird's insides. Nurse Sutherland professed the tasks assigned to an employee in the evisceration department involve repetitive work, "to some degree."

After Hargrove passed the physical, Perdue hired her to work in the evisceration department. Hargrove began her employment with Perdue on March 13, 2000.[1] The first week consisted of orientation. Nurse Sutherland testified Hargrove worked 25.61 hours her first week. The first day of her employment consisted of classroom training for the entire day. On each remaining day of her first week, Hargrove spent four hours in the classroom and four hours on a training line. Both Nurse Sutherland and Hargrove testified that new employees could move more slowly on a training line than on a regular line.

Hargrove worked 23.18 hours her second week. Unlike the previous week, she did not have any classroom training and spent all of her time on a regular line, which processed 2,000 to 5,000 chickens each day. Hargrove stated that although she was on a regular line, she did not move as fast as other employees. She declared that her job during this week consisted of pulling the skin off of chickens and removing the remaining entrails from the processed chickens.

On or around March 16, 2000, having finished her shift at Perdue, Hargrove informed Peele, her supervisor at Dillon Yarn, that she was experiencing pain in her left wrist and arm. Hargrove did not tell Peele she believed the problems with her arm were work-related and Peele did not ask if they were. According to Peele, this was the first time Hargrove com-

---

1. Hargrove testified she was seeking a first shift job that would enable her to go back to school in the evenings. However, she was working both jobs when the problems underlying this appeal occurred.

plained of pain in her hand and arm. Hargrove made similar complaints to Peele on at least two more occasions, although Peele did not keep a record of the complaints. Peele indicated Hargrove's "job was repetitive."

On March 23, 2000, Hargrove worked her shift at Perdue. She testified that, after performing her usual job on the evisceration line for a short time, the line went down and she was instructed to work in the box room. Her duties there consisted of retrieving the boxes others were assembling in the room. When her shift was over, Hargrove went to work her second-shift position at Dillon Yarn.

After clocking in, but before working, Hargrove noticed a funny feeling in the fingers on her left hand. Hargrove declared that nothing happened to her hand or arm between the time she left Perdue and the time she arrived at Dillon Yarn that would explain the problems she began having.

Hargrove stated she went to Dillon Yarn's nurse, Joyce Harmon, and "asked [Harmon] about the funny feeling in [her] fingers." Hargrove requested something for pain. The nurse gave Hargrove some Tylenol and then Hargrove went to work as usual. As she was performing her normal duties, Hargrove picked up a tube and it fell from her grasp. She testified that after she dropped the tube she looked down at her left hand and noticed it was swollen. Hargrove went to her supervisor and asked if she could be excused to go see a doctor. She was given permission and went to see her family physician, Dr. Michael Brown, the next day, March 24.

In his medical report, Dr. Brown noted: "Has tenderness over the extensor surface left hand and also at base of the thumb." Dr. Brown x-rayed the hand, placed it in a splint, and prescribed medication. He wrote Hargrove an excuse from work for a few days.

On March 27, 2000, Hargrove went to the medical department at Perdue to provide Dr. Brown's letter excusing her from work. Nurse Sutherland professed she did not ask Hargrove whether the injury was work-related because she did not feel Hargrove had worked at Perdue long enough to have experienced an injury there. Nevertheless, Nurse Suth-

erland reviewed Hargrove's file and sent her to Perdue's company physician, Dr. Phil Wallace.[2]

Dr. Wallace's report, dated March 27, 2000, indicates Hargrove's left wrist and hand showed "slight swelling." He diagnosed "probable mild tendonitis" and modified her activities for two weeks. The report demonstrates that Dr. Wallace "advised [Hargrove] she probably needs to pick one or the other job" because he did not "think she [could] physically handle both." Dr. Wallace noted, under a section in the report subtitled "ADD," that he "[t]alked with Perdue, felt this was not probably W/C, situation where she is using too much work in both." Regarding this particular notation, the Single Commissioner concluded:

> The report does speak for itself. A.D.D., I believe, based on reading medical reports stands for addendum. Meaning this is after he talked with Perdue he added this.
>
> . . . .
>
> Well, he doesn't say in the addendum [what his opinion is]. He says "talked with Perdue. Felt this was probably [not] W.C. situation where she's using too much work in both something. They both agreed to give her"—he doesn't say that this—whether this was his. It looks to me like, "talked with Perdue. Felt this was not probably W.C. like Perdue was saying it wasn't Workers' Comp.

Dr. Wallace issued excuses from work, which Hargrove took to both Dillon Yarn and Perdue.[3] On Hargrove's visit to Dillon Yarn, Harmon, the plant nurse, gave her a long-term disability form to complete. Hargrove testified she completed the form and sent it to Dr. Wallace. Harmon stated she talked to Dr. Wallace and received the disability form back from him, which indicated Hargrove's problems with her arm were work-related. In response to the question on the form whether the condition was "due to injury or sickness arising out of patient's employment," Dr. Wallace checked the box after "Yes."

---

2. Dr. Wallace is the company doctor for both Perdue and Dillon Yarn.

3. Hargrove did not return to work for either employer following her first visit with Dr. Wallace.

On April 5, 2000, after noting Hargrove was continuing to have pain and limitation of movement in her wrist, Dr. Wallace referred her to Dr. Dwight Jacobus. Dr. Jacobus, an orthopedic surgeon, is one of Perdue's approved doctors for injuries that are work-related. Dr. Jacobus first saw Hargrove on April 7, 2000. He testified that his "initial impression, after [he] took a history and physical, was that of a possible carpal tunnel syndrome as it related to her left upper extremity." Dr. Jacobus saw Hargrove on at least four occasions and performed a number of tests and diagnostic studies to determine the root cause of her problems. Dr. Jacobus noted Hargrove continued to experience pain and swelling in her left hand. In a medical record dated May 15, 2000, Dr. Jacobus stated: "I still find no specific clinical abnormality other than some changes that possibly might represent an early reflex sympathetic dystrophy. I think a 2nd opinion is important and I have convinced her of that."

On January 18, 2001, Dr. Jacobus wrote a letter to Hargrove's attorney which declared: "It would be my opinion that the symptoms related to the left upper extremity were most probably caused and aggravated by repetitive activities related to her work." In a later deposition, Dr. Jacobus reaffirmed this opinion. In fact, he specifically opined that Hargrove's (1) "long-term repetitious activities" at Dillon Yarn "would have been the activities that instituted the changes leading to the diagnosis or at least the symptoms of carpal tunnel syndrome"; and (2) "secondary job responsibilities of stripping chicken skin" at Perdue "would therefore possibly ... exacerbate the symptoms that were instituted by the initial employee responsibilities."

Because Hargrove was still complaining of pain and discomfort, Dr. Jacobus felt it prudent to seek a second opinion. Thus, Hargrove was referred to Dr. Robert W. Moore, a physician in Florence, who specializes in upper extremity problems. Dr. Moore diagnosed Hargrove with reflex sympathetic dystrophy in her left hand. He suggested that Hargrove participate in pain management, as well as hand therapy and several other treatments. A series of epidural blocks was performed. Hargrove stated these treatments were not helpful.

Responding to a letter from Hargrove's attorney, Dr. Moore stated in a letter dated January 3, 2001, that it was his "opinion that [Hargrove's] problem was not caused by the repetitive activities she performed at Dillon Yarn." Unable to make much progress towards Hargrove's improvement, Dr. Moore referred Hargrove to Dr. James A. Nunley at the Duke University Medical Center. Dr. Nunley agreed that it "looks like she does in fact have reflex sympathetic dystrophy." He noted she "shows the skin changes, the swelling." Dr. Nunley suggested Hargrove be referred to Dr. L. Andrew Koman at Bowman Gray Medical School Reflex Sympathetic Dystrophy Clinic. Hargrove testified she did not go to Bowman Gray.

On July 19, 2000, Hargrove filed a Form 50 seeking Workers' Compensation benefits against Dillon Yarn alleging repetitive trauma as the cause of her injuries. Hargrove asserted that "[d]ue to injury, the claimant is in need of . . . medical examination and treatment for carpal tunnel syndrome." Dillon Yarn denied Hargrove was entitled to benefits. Dillon Yarn then moved to add Perdue as a co-defendant. Perdue was joined as a party by order dated December 14, 2001. Both Dillon Yarn and Perdue claimed the injuries, if work-related, happened when Hargrove was working for the other.

In her order, the Single Commissioner found the following facts:

1. Claimant sustained compensable injuries by accident arising out of and in the course of her employment on March 23, 2000 with both employers.

2. The employment with Dillon Yarn (Titan Textile) caused claimant's carpal tunnel syndrome.

3. Claimant's employment with Perdue exacerbated her condition.

4. The last date of injurious exposure occurred while the employment relationship existed concurrently.

5. It would be unfair to have one employer accept 100% liability under a theory of last date of injurious exposure when the difference in the last work date—not employment date—was only a matter of hours and included a weekend. Consideration is given also to the work schedule and how it may have figured into dates worked.

The Commissioner concluded: "Pursuant to Section 42–1–160, claimant sustained compensable injuries by accident on March 23, 2000 with both employers." The Commissioner ruled that Hargrove was entitled to temporary total disability as well as payment of medical expenses, to be split evenly between the employers.

Both employers appealed this decision to an Appellate Panel of the South Carolina Workers' Compensation Commission (the Appellate Panel). The Appellate Panel issued an order unanimously affirming the ruling of the Single Commissioner in its entirety:

> After careful review in the instant case, the Appellate Panel has determined that all of the Hearing Commissioner's Findings of Fact and Rulings of Law are correct as stated. We find that such Findings of Fact and Conclusions of Law are hereby included in this Order by reference.... Accordingly, the Findings of Fact and Conclusions of Law set forth in the single commissioner's Order shall become, and hereby are, the law of the case; and, therefore, the Order is sustained in its entirety.

The employers appealed the Appellate Panel's decision to the Circuit Court. The Circuit Court issued a form order affirming the decision. Specifically, the Circuit Court found: "There is substantial evidence to support the Commission's order and therefore it is affirmed." Perdue appealed the Circuit Court's order to this Court.[4]

## STANDARD OF REVIEW

■■■ The South Carolina Administrative Procedures Act (APA) establishes the standard for judicial review of decisions of the Workers' Compensation Commission. *See Lark v. Bi-Lo, Inc.,* 276 S.C. 130, 276 S.E.2d 304 (1981); *Gibson v. Spartanburg Sch. Dist. No. 3,* 338 S.C. 510, 526 S.E.2d 725 (Ct.App.2000). A reviewing court may reverse or modify a decision of an agency if the findings, inferences, conclusions or decisions of that agency are "clearly erroneous in view of the reliable, probative and substantial evidence on the whole record." *Bursey v. South Carolina Dep't of Health and Envtl.*

---

4. Dillon Yarn did not appeal this final order and, in fact, participates in this appeal as a Respondent.

*Control,* Op. No. 3813, 360 S.C. 135, 600 S.E.2d 80, (Ct.App. filed June 1, 2004) (Shearouse Adv. Sh. No. 24 at 47); S.C.Code Ann. § 1–23–380(A)(6)(e) (Supp.2003). Under the scope of review established in the APA, this Court may not substitute its judgment for that of the Commission as to the weight of the evidence on questions of fact, but may reverse where the decision is affected by an error of law. *Frame v. Resort Servs., Inc.,* 357 S.C. 520, 593 S.E.2d 491 (Ct.App.2004); *Stephen v. Avins Constr. Co.,* 324 S.C. 334, 478 S.E.2d 74 (Ct.App.1996); S.C.Code Ann. § 1–23–380(A)(6)(d) (Supp. 2003).

▪ The substantial evidence rule of the APA governs the standard of review in a Workers' Compensation decision. *Frame,* 357 S.C. at 527, 593 S.E.2d at 494; *Corbin v. Kohler Co.,* 351 S.C. 613, 571 S.E.2d 92 (Ct.App.2002). This Court's review is limited to deciding whether the Commission's decision is unsupported by substantial evidence or is controlled by some error of law. *See Gibson,* 338 S.C. at 517, 526 S.E.2d at 728–29; *see also Lyles v. Quantum Chem. Co. (Emery),* 315 S.C. 440, 434 S.E.2d 292 (Ct.App.1993) (noting that in reviewing decision of Workers' Compensation Commission, Court of Appeals will not set aside its findings unless they are not supported by substantial evidence or they are controlled by error of law).

▪ Substantial evidence is not a mere scintilla of evidence, nor the evidence viewed blindly from one side of the case, but is evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion the administrative agency reached in order to justify its action. *Etheredge v. Monsanto Co.,* 349 S.C. 451, 562 S.E.2d 679 (Ct.App.2002); *Broughton v. South of the Border,* 336 S.C. 488, 520 S.E.2d 634 (Ct.App.1999). The Appellate Panel is the ultimate fact finder in Workers' Compensation cases and is not bound by the Single Commissioner's findings of fact. *Gibson,* 338 S.C. at 517, 526 S.E.2d at 729; *Muir v. C.R. Bard, Inc.,* 336 S.C. 266, 519 S.E.2d 583 (Ct.App.1999). The final determination of witness credibility and the weight to be accorded evidence is reserved to the Appellate Panel. *See Shealy v. Aiken County,* 341 S.C. 448, 535 S.E.2d 438 (2000); *Parsons v. Georgetown Steel,* 318 S.C. 63, 456 S.E.2d 366 (1995); *Gibson,*

338 S.C. at 517, 526 S.E.2d at 729. The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. *Sharpe v. Case Produce, Inc.,* 336 S.C. 154, 519 S.E.2d 102 (1999); *Muir,* 336 S.C. at 282, 519 S.E.2d at 591. Where there are conflicts in the evidence over a factual issue, the findings of the Appellate Panel are conclusive. *Etheredge,* 349 S.C. at 455, 562 S.E.2d at 681.

The findings of an administrative agency are presumed correct and will be set aside only if unsupported by substantial evidence. *Anderson v. Baptist Med. Ctr.,* 343 S.C. 487, 541 S.E.2d 526 (2001); *Hicks v. Piedmont Cold Storage, Inc.,* 335 S.C. 46, 515 S.E.2d 532 (1999). It is not within our province to reverse findings of the Appellate Panel which are supported by substantial evidence. *Broughton,* 336 S.C. at 496, 520 S.E.2d at 637. The appellate court is prohibited from overturning findings of fact of the Appellate Panel, unless there is no reasonable probability the facts could be as related by the witness upon whose testimony the finding was based. *Etheredge,* 349 S.C. at 455–56, 562 S.E.2d at 681.

In the current case, after "careful review," the Appellate Panel found "that all of the Hearing Commissioner's Findings of Fact and Rulings of Law [were] correct as stated." Thus, the Appellate Panel adopted the Single Commissioner's findings of fact and rulings of law by reference into its final order as it is entitled to do under sections 1–23–350 and 42–17–40 of the South Carolina Code. *See* S.C.Code Ann. §§ 1–23–350 (1986) & 42–17–40 (Supp.2003); *see also Eaddy v. Smurfit–Stone Container Corp.,* 355 S.C. 154, 584 S.E.2d 390 (Ct.App. 2003) (interpreting these statutory provisions and concluding the Appellate Panel meets the requirements contained therein when it incorporates a Single Commissioner's findings of fact and rulings of law by reference into its order).

## *LAW/ANALYSIS*

Perdue's sole argument on appeal is that the Circuit Court erred in finding the Appellate Panel's decision was supported by substantial evidence. We disagree.

## I. *Pee v. AVM*

█ Perdue claims Hargrove did not attribute her injury to her work at Perdue. Perdue contends Hargrove "was able to identify a specific incident on March 23, 2000 at Dillon Yarn which caused an acute aggravation of her underlying condition." However, as Perdue acknowledges, it is not necessary for a claimant to identify a specific precipitating event in order for the claimant to be entitled to benefits. Our Supreme Court addressed this issue in *Pee v. AVM, Inc.,* 352 S.C. 167, 573 S.E.2d 785 (2002):

> Employer contends a repetitive trauma injury does not qualify as an "injury by accident" because the cause of the injury is not unexpected and the injury lacks definiteness of time.....
>
> ....
>
> As we more recently stated, "in determining whether something constitutes an injury by accident the focus is not on some specific event, but rather on the injury itself." *Stokes v. First Nat'l Bank,* 306 S.C. 46, 50, 410 S.E.2d 248, 250 (1991). Further, an injury is unexpected, bringing it within the category of accident, if the worker did not intend it or expect it would result from what he was doing. *Colvin [v. E.I. DuPont De Nemours Co.],* 227 S.C. at 468–69, 88 S.E.2d at 582 (emphasis added). Therefore, if an injury is unexpected from the worker's point of view, it qualifies as an injury by accident. Here, there is no evidence Claimant intended or expected to be injured as a result of her repetitive work activity.
>
> Employer's contention that the cause of the injury must be unexpected is incorrect. Under South Carolina law, if the injury itself is unexpected, it is compensable as an injury by accident.
>
> ....
>
> Definiteness of time, while relevant to proving causation, is not required to prove an injury qualifies as an injury by accident. For instance, in *Sturkie v. Ballenger Corp.,* 268 S.C. 536, 235 S.E.2d 120 (1977), we found the claimant's emphysema, which developed gradually, was caused by repeated exposure to high humidity and dust on the job and was therefore compensable as an injury by accident. Simi-

larly, in *Stokes, supra,* we found a psychological disorder which developed over a period of months compensable as an injury by accident.

. . . .

Here, it is uncontested that Claimant's carpal tunnel syndrome was caused by her work activities. The lack of a definite time of injury is therefore not dispositive.

*Pee,* 352 S.C. at 170–72, 573 S.E.2d at 787–88 (footnote omitted). Whether Hargrove could identify a precipitating event is irrelevant in determining if she is entitled to benefits.

Perdue maintains Hargrove exonerated the company when she stated that nothing unusual happened to her arm while she was working there and that she never experienced pain and swelling in her hand after working at Perdue. Yet, this testimony does not provide a full account of the evidence presented on the issue. Hargrove testified that on March 23, 2000, after working a full shift at Perdue, she went to her second-shift job at Dillon Yarn. She declared that after she clocked in, but before beginning her shift, she began experiencing a funny feeling in the fingers of her left hand. Furthermore, her supervisor at Dillon Yarn professed Hargrove never complained about experiencing problems with her arms or hands prior to her beginning the job at Perdue. Thus, the evidence clearly shows Hargrove had problems with her left hand and arm after working at Perdue.

Perdue gives credence to the fact that Hargrove did not work full time her first two weeks at Perdue. Hargrove worked 25.61 hours her first week at Perdue and 23.18 hours the second week. Although the entire first day consisted of classroom training, for the remainder of her days the first week, Hargrove spent four hours in class and four hours performing her normal job, which consisted of pulling the skin off of chickens and removing their entrails. Hargrove testified she spent the majority of her time the second week on a regular line, which processed anywhere from 2,000 to 5,000 chickens per day. Furthermore, Dr. Jacobus concluded Hargrove's "long-term repetitious activities" at Dillon Yarn caused the carpal tunnel syndrome and her job at Perdue "possibly ... exacerbate[d]" the problems. Concomitantly, there is

substantial evidence in the record that Hargrove's activities while working for Perdue exacerbated her condition.

## II. Dr. Jacobus

After providing a summary of the evidence presented, the Single Commissioner made specific findings of fact, including that Hargrove's employment with Dillon Yarn caused her carpal tunnel syndrome and her employment with Perdue exacerbated the condition. Perdue avers the Single Commissioner misinterpreted Dr. Jacobus' testimony. Specifically, Perdue asserts the Single Commissioner erred when she noted in her order that Dr. Jacobus "stated that both jobs would have exacerbated her problem."

The disputed testimony arose as a result of a hypothetical question posed by Hargrove's attorney. The question followed the chain of events in Hargrove's case, but inaccurately suggested Hargrove spent one entire week in orientation followed by two weeks of performing her normal job. The attorney then asked Dr. Jacobus if he had an opinion as to which job would most likely be the cause of Hargrove's problem. Dr. Jacobus responded:

> It would therefore be my opinion that the long-term repetitious activities, as I believe you related with her first job activities would have been the activities that instituted the changes leading to the diagnosis or at least the symptoms of carpal tunnel syndrome. The secondary job responsibilities of stripping chicken skin, as I perceive that to be, would therefore possibly exacerbate—exacerbate the symptoms that were instituted by the initial employee responsibilities.

This was not the first or only time Dr. Jacobus indicated he considered Hargrove's injuries to be work-related. In a letter dated January 18, 2001, Dr. Jacobus stated: "It would be my opinion that the symptoms related to the left upper extremity were most probably caused and aggravated by repetitive activities related to her work."

Expert medical testimony is designed to aid the Appellate Panel in coming to the correct conclusion. *Sharpe v. Case Produce, Inc.*, 336 S.C. 154, 519 S.E.2d 102 (1999); *Tiller v. National Health Care Ctr.*, 334 S.C. 333, 513 S.E.2d 843 (1999). Therefore, the Appellate Panel determines the

weight and credit to be given to the expert testimony. *Tiller,* 334 S.C. at 340, 513 S.E.2d at 846; *Corbin v. Kohler Co.,* 351 S.C. 613, 571 S.E.2d 92 (Ct.App.2002). Once admitted, expert testimony is to be considered just like any other testimony. *Tiller,* 334 S.C. at 340, 513 S.E.2d at 846; *Corbin,* 351 S.C. at 624, 571 S.E.2d at 98.

 "If a medical expert is unwilling to state with certainty a connection between an accident and an injury, the 'expression of a cautious opinion' may support an award if there are facts outside the medical testimony that also support an award." *Tiller,* 334 S.C. at 340, 513 S.E.2d at 846. Thus, if medical expert testimony is not solely relied upon to establish causation, the fact finder must look to the facts and circumstances of the case. *Id.* at 341, 513 S.E.2d at 846. Proof that a claimant sustained an injury may be established by circumstantial and direct evidence where circumstances lead an unprejudiced mind to reasonably infer the injury was caused by the accident. *Id.* at 341, 513 S.E.2d at 846–47. However, such evidence need not reach such a degree of certainty as to exclude every reasonable or possible conclusion other than that reached by the Commission. *Id.* at 341, 513 S.E.2d at 847.

 Although medical testimony is entitled to great respect, the fact finder may disregard it if there is other competent evidence in the record. *See Tiller,* 334 S.C. at 340, 513 S.E.2d at 846 (stating that medical testimony should not be held conclusive irrespective of other evidence). In deciding whether substantial evidence supports a finding of causation, it is appropriate to consider both the lay and expert evidence. *Sharpe,* 336 S.C. at 161, 519 S.E.2d at 106.

Neither the Single Commissioner nor the Appellate Panel erred in relying on the testimony of Dr. Jacobus. The subtle differences posed in the hypothetical question, compared to the actual events, merely affect the weight of the doctor's testimony and not its validity.

### III. Aggravation of Pre–Existing Condition

Perdue asserts "Dr. Jacobus said nothing about any permanent injury being caused by her employment at Perdue. He only speculated about an aggravation of symptoms."

▮▮▮▮ A work-related accident which aggravates or accelerates a pre-existing condition, infirmity, or disease is compensable. *Brown v. R.L. Jordan Oil Co.,* 291 S.C. 272, 353 S.E.2d 280 (1987); *Sturkie v. Ballenger Corp.,* 268 S.C. 536, 235 S.E.2d 120 (1977); *Mullinax v. Winn–Dixie Stores, Inc.,* 318 S.C. 431, 458 S.E.2d 76 (Ct.App.1995). A condition is compensable unless it is due solely to the natural progression of a pre-existing condition. *Mullinax,* 318 S.C. at 437, 458 S.E.2d at 80. It is no defense that the accident, standing alone, would not have caused the claimant's condition, because the employer takes the employee as it finds him or her. *Id.* "[A]ggravation of a pre-existing condition is compensable where disability is continued for a longer time, even though no disability would normally have resulted from the injury alone, or even if the aggravation would have caused no injury to an employee who was not afflicted with the condition." *Id.* (internal quotations omitted).

▮▮▮▮ When a pre-existing condition or disease is accelerated or aggravated by injury or accident "arising out of and in the course of the employment," the resulting disability is a compensable injury. *Brown,* 291 S.C. at 275, 353 S.E.2d at 282; *Arnold v. Benjamin Booth Co.,* 257 S.C. 337, 185 S.E.2d 830 (1971); *see also Sturkie,* 268 S.C. at 541, 235 S.E.2d at 122 (exacerbation of pre-existing disease or injury arising out of or in course of employment is compensable).

▮▮▮▮ The right of a claimant to compensation for aggravation of a pre-existing condition arises only where there is a dormant condition which has produced no disability but which becomes disabling by reason of the aggravating injury. *Hines v. Pacific Mills,* 214 S.C. 125, 51 S.E.2d 383 (1949). A determination of whether a claimant's condition was accelerated or aggravated by an accidental injury is a factual matter for the Appellate Panel. *Brown,* 291 S.C. at 275, 353 S.E.2d at 282. Where there is a conflict in the evidence from the same or different witnesses, the Panel's findings of fact may not be set aside. *Id.*

### IV. Substantial Evidence to Support Decision of Appellate Panel

▮▮▮▮ After thoroughly reviewing the record, we find substantial evidence supports the Appellate Panel's ruling. Har-

grove's supervisor at Dillon Yarn testified Hargrove never complained about problems with her hand or arm prior to beginning her employment with Perdue. Although Hargrove experienced problems with her hand and arm before working at Perdue, she said she would go home after work and soak her hand and arm and then "it would be all right"—"[t]he pain would go away" and the "swelling would go down."

On March 1, 2000, Hargrove applied for her position at Perdue. At that time, she was given a physical specifically designed for the rigors of the job for which she was applying. Several of the tests were aimed at detecting problems with her arms and/or hands. Nurse Sutherland testified Hargrove passed all the tests with no problems and possessed a strong grip in both hands.

On March 16, 2000, after completing her shift at Perdue, Hargrove complained to her supervisor at Dillon Yarn for the first time that her hand and arm were giving her problems. On March 23, 2000, Hargrove finished her shift at Perdue and was clocking in at Dillon Yarn when she noticed a funny feeling in the fingers on her left hand. At the time this "funny feeling" began, Hargrove had not yet started her work duties for the day at Dillon Yarn. Later that night, Hargrove's arm became swollen and she asked if she could be excused to go see a doctor.

On March 27, 2000, Hargrove was sent to Dr. Wallace, who opined that he did not "think she [could] physically handle both [jobs]." Dr. Wallace referred Hargrove to Dr. Jacobus, who expressed the opinion that her condition was indeed work-related.

In deciding whether substantial evidence exists, it is appropriate to consider both the lay and expert evidence. *See Sharpe v. Case Produce, Inc.,* 336 S.C. 154, 519 S.E.2d 102 (1999). Although there is evidence from which the Appellate Panel could have gone the other way, there is clearly evidence which would allow reasonable minds to reach the conclusion the Panel reached. Substantial evidence supports the Appellate Panel's finding that Hargrove's work at Perdue aggravated or exacerbated her pre-existing condition.

## CONCLUSION

We find substantial evidence supports the Appellate Panel's order. The Circuit Court did not err in affirming this decision. Accordingly, the Circuit Court's ruling is

**AFFIRMED.**

HUFF, J., concurs.

KITTREDGE, J., dissents in a separate opinion.

KITTREDGE, J.:

I respectfully dissent. This appeal presents the question of whether substantial evidence supports the Commissions finding that Sandra Hargroves nine-day tenure at Perdue Farms—comprised entirely of orientation, training and light work—exacerbated a condition caused by her long-time employment at Dillon Yarn. Having carefully considered the record and applicable standard of review, I would reverse based on my conclusion that the Commission's finding that Hargrove aggravated her pre-existing condition in the course of her brief employment at Perdue Farms is not supported by substantial evidence. In my judgment, the Commissions decision rests solely on speculation.

Hargroves condition undisputedly originated from her work at Dillon Yarn, where she was employed periodically from 1992 through March 23, 2000. Neither Hargrove nor Dillon Yarn dispute the Commissions finding that Hargroves condition was caused by her employment with Dillon Yarn. Thus, this finding is the law of the case. *See Unisun Ins. v. Hawkins,* 342 S.C. 537, 544, 537 S.E.2d 559, 563 (Ct.App.2000) (stating an unappealed ruling is the law of the case which the appellate court must assume was correct). Hargrove worked eight-hour shifts at Dillon Yarn, during which she would lift, bag, and box between 600 and 800 spools of yarn from a texturing machine.

On March 13, 2000, Hargrove began her brief tenure with Perdue Farms, while continuing to work full-time at Dillon Yarn. Hargrove worked only 25.61 hours in her first of two weeks as an employee of Perdue Farms. Her first day of employment at Perdue Farms was entirely devoted to orienta-

tion and classroom training. On the remaining four days of her first week, Hargrove spent four hours each day receiving additional classroom training and four hours each day on a special production line used to train new employees. The training line moved at half the speed of the normal production lines. Hargrove would rotate between functions throughout the day rather than doing one thing repetitively all day. According to Hargrove, the work using her hands did not involve "any real effort."

During Hargrove's second week at Perdue Farms, she worked 23.18 hours over a four-day period. She continued to work at a training line until fourth day, March 23, 2000, when the line went down. Although she "didn't do much that day" at Perdue Farms, Hargrove did help move empty boxes. Later that same day, Hargrove went to her job at Dillon Yarn, where she complained to her supervisor that her left hand was "swollen," "feeling funny," and had "started hurting." The supervisor sent her to the plant's nurse, who gave Hargrove Tylenol. Hargrove completed her shift, but later went to a physician for additional treatment. Upon the physician's recommendation, Hargrove did not return to work at Dillon Yarn or Perdue Farms. She later brought the present action, seeking workers' compensation benefits from Dillon Yarn. Dillon Yarn joined Perdue Farms as a defendant.

In deposition testimony, the following exchange occurred between Dillon Yarn's counsel and Hargrove:

[Counsel]: Did the fingers on your left hand feel funny while you were working at Perdue [on March 23, 2000]?

[Hargrove]: No sir.

When Dillon Yarn's counsel asked Hargrove whether she had "ever felt that funny feeling before," Hargrove responded, "The only time I felt that is like when I worked hard at Dillon Yarn." When questioned as to whether she had any knowledge of an incident or accident at Perdue Farms related to her condition, she responded, "No, sir."

Dr. Dwight Jacobus, a general orthopedic surgeon who served as one of Hargrove's treating physicians, provided additional deposition testimony. During the deposition, a hypothetical question posed to Dr. Jacobus solicited his opin-

ion regarding which of Hargrove's jobs had caused her condition, or whether the condition was caused by "a combination of the two" jobs. In pertinent part, the hypothetical was premised on the false assumption that Hargrove's employment at Perdue Farms consisted of "one week of training and two weeks of actually performing the job." Jacobus opined that the long-term, repetitive nature of her job at Dillon Yarn "would have been the activities that instituted the changes leading to the diagnosis or at least the symptoms of carpal tunnel syndrome." He added that the "secondary job responsibilities of stripping chicken [at Perdue Farms], as I perceive that to be, would therefore **possibly** exacerbate symptoms that were instituted by the initial responsibilities [at Dillon Yarn.]" (emphasis added).

The order of the single commissioner erroneously stated that Dr. Jacobus opined that Hargroves "left upper extremity problems were most **probably** caused and aggravated by her work [and] both jobs would have exacerbated her problem." (emphasis added). The commissioner concluded that Hargroves work at Perdue exacerbated her pre-existing condition. Consequently, the commissioner ordered Dillon Yarn and Perdue Farms to each pay one-half of the temporary total disability benefits awarded Hargrove, as well as charges for all past, present, and continuing medical expenses related to the injury. An appellate panel of the Commission affirmed, adopting all of the single commissioners findings. The circuit court affirmed the Commission.

I recognize that in workers compensation cases, compensation may be awarded although "a medical expert is unwilling to state with certainty a connection between an accident and an injury if there are facts outside the medical testimony that also support an award." *Tiller v. Natl. Health Care Ctr.*, 334 S.C. 333, 340, 513 S.E.2d 843, 846 (1999), citing *Grice v. Dickerson, Inc.*, 241 S.C. 225, 127 S.E.2d 722 (1962). This court applied this principle in *Muir v. C.R. Bard, Inc.*, 336 S.C. 266, 287, 519 S.E.2d 583, 594 (Ct.App.1999) ("If a medical expert is unwilling to state with certainty a connection between an accident and an injury, the expression of a cautious opinion may support an award if there are facts outside the medical testimony that also support an award"). Here, the Commission relied *solely* on the testimony of Dr. Jacobus in

finding that Hargroves employment at Perdue Farms exacerbated her condition. The Commission adopted the single commissioners finding that Dr. Jacobus opined that Hargroves condition was "most probably" exacerbated by both of her jobs. Dr. Jacobus rendered no such opinion, as he only testified that Hargroves work at Perdue Farms "**possibly** exacerbate[d]" symptoms of the condition caused by her work at Dillon Yarn. At best, Dr. Jacobus provided an "expression of a cautious opinion" with respect to the relationship between Hargroves condition and her work at Perdue Farms. There is no additional evidence, lay or otherwise, supporting an award against Perdue Farms. In fact, Hargroves testimony refutes any suggestion or inference of a connection between her injury and her nine-day employment at Perdue Farms, which she conceded did not involve "any real effort." "Workers' compensation awards must not be based on surmise, conjecture or speculation." *Tiller,* 334 S.C. at 339, 513 S.E.2d at 845.

I reach this conclusion fully cognizant of the deferential substantial evidence standard of review applicable to appeals from the Commission. Consistent with this deferential standard of review, an appellate court must nevertheless ensure the record contains some evidence beyond a mere scintilla which, considering the record as a whole, would allow reasonable minds to concur in the conclusion reached by the Commission. *See Lark v. Bi–Lo, Inc.,* 276 S.C. 130, 135, 276 S.E.2d 304, 306 (1981) (holding that an appellate courts review of appeals from the Commission is limited to deciding whether the Commissions decision is unsupported by substantial evidence or is controlled by some error of law); *Broughton v. South of the Border,* 336 S.C. 488, 496, 520 S.E.2d 634, 637 (Ct.App.1999) ("Substantial evidence is not a mere scintilla of evidence, nor the evidence viewed blindly from one side of the case, but is evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion the administrative agency reached in order to justify its action"). Mindful of this deferential standard of review, the record in my judgment yields, at best, a mere scintilla of evidence to support the Commissions finding that Hargrove aggravated her pre-existing condition in the course of her brief employment at Perdue Farms. I would reverse.